IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO PATROL SPECIAL POLICE OFFICERS ALAN BYARD, an individual, ROBERT L. BURNS, an individual, CALVIN C. WILEY, an individual, JOHN J. ANDREWS, an individual, SCOTT HART, an individual, TODD HART, an individual, SAMUEL J. REYES, SR., an individual, THEODORE TORRES, an individual, JOHN BARRY, an individual, SERGE J. WHITE, an individual, HANLEY CHAN, an individual, EARL L. CURTIS, an individual, ANTHONY CIRIMELE, an individual, JOHN FITZINGER, an individual, THE SAN FRANCISCO PATROL SPECIAL POLICE OFFICERS ALLIANCE, a public benefit corporation, THE SAN FRANCISCO PATROL SPECIAL POLICE OFFICERS ASSOCIATION, INC., a public benefit corporation, and SAN FRANCISCO PATROL POLICE, an unincorporated association,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO, a public incorporation, THE SAN FRANCISCO POLICE DEPARTMENT, a public incorporation, SERGEANT GERALD DARCY, an individual, INSPECTOR MARTIN OHALLORAN, an individual, SERGEANT UEUGEN GELEANO, an individual, SERGEANT JOHN BRAGAGNOLO, an individual, SERGEANT JESUS PENA, an individual, OFFICER MICHAEL SIMMONS, an individual, SERGEANT PETER THOSHINSKY, an individual, OFFICER JOHN VAN KOLL, an individual, OFFICER THOMAS CUNNANE, an individual, OFFICER RANDY LY, an individual, and DOES 1 through 10,000, inclusive,<br><br>    Defendants.<br>_____/ | No. C 16-00691 WHA<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO SUBSTITUTE PARTIES** |

**INTRODUCTION**

In this action alleging efforts by San Francisco to undermine the business of a private police force, defendants move for summary judgment. To the extent stated below, summary judgment is **GRANTED**.

**STATEMENT**

This case features a little-known species of private police called "patrol special police officers" whose pedigree in San Francisco dates back over a century. This interesting history informs the constitutional issues presented.

In 1900, the City and County of San Francisco adopted a charter, which gave the Board of Police Commissioners the power to appoint and remove (at its pleasure) "special police officers," as follows (Defs.' RJN, Exh. A, Art. VIII, Ch. III § 1 ¶ 4):

> At its discretion, upon the petition of any person, firm or corporation, to appoint and at pleasure to remove, special police officers. Such officers shall be subject to all the rules and regulations of the Board.

The 1900 Charter did not refer to "patrol special police officers," which are the subject of this lawsuit.

In 1932, San Francisco enacted a new charter. The new charter provided for the appointment and removal (at the police commission's pleasure) of "special police officers" (with language nearly identical to that in the 1900 charter) and also provided for the appointment and removal (for cause) of "patrol special police officers," as follows (Defs.' RJN, Exh. B § 35):

> The police commission may appoint, and, for cause, remove patrol special police officers. Each patrol special police officer shall be at the time of appointment, not less than twenty-one years of age nor more than forty-five years of age, and must possess such physical qualifications as may be required by the commission. Age qualifications shall not apply to patrol special police officers appointed and acting at the time this carter shall go into effect nor to their re-appointment.

Patrol special police officers were paid by private clientele in the neighborhoods (or "beats") in which they worked.

2

The 1932 Charter was recodified and amended in 1943. The 1943 Charter preserved the language above regarding patrol special police officers but added the following provision (Defs.' RJN, Exh. C § 35.10):

> Patrol special police officers who are designated by the police commission as the owners of certain beat or territory [sic] as may be fixed from time to time by said commission or the legal heirs or representatives of said owners, may dispose of their interest in said beat or territory to a person of good moral character, approved by the police commission and eligible for appointment as a patrol special police officer.

In 1970, the Police Commission adopted rules and procedures for "Patrol Special Officers and Assistant Patrol Special Officers" (Defs.' RJN, Exh. F).

The Charter was again recodified and amended in 1971. The section pertaining to patrol special police officers underwent only minor changes. Specifically, the amended language set the maximum age for a patrol special police officer at forty, limited any "grandfathering" to patrol special police officers to those appointed before the 1943 Charter took effect, and corrected a typographical error (*see* Defs.' RJN, Exh. D § 3.536).

In 1973, San Francisco adopted Section 10B of its Administrative Code, authorizing the Police Department to provide additional law enforcement services upon request by persons, corporations, firms, or organizations, at the requester's cost (Bakondi Second Supp. Decl., Tab 49).

In 1987, the San Francisco City Attorney issued a public opinion regarding whether patrol special police officers constituted "peace officers" under state law (and were therefore entitled to receive certain training) and whether the Police Commission could alter the peace officer status via amendments to the rules and regulations applicable to the patrol special police officers. The City Attorney responded "yes" to both inquiries, with certain caveats (Baumgartner Decl., Exh. 16). Specifically, the City Attorney advised that an amendment to the Charter, rather than a change in rules, would be preferable in resolving the status of patrol special police officers as peace officers vel non. This was because, the City Attorney opined, the Charter as written did not permit the Police Commissioner to eliminate the patrol special police officers without a Charter amendment, and thus could not effect a "de facto elimination

3

. . . by so limiting their powers and duties as to render their services worthless" (Baumgartner Decl., Exh. 16 at 8).

The City Attorney further concluded that the patrol special police officers had "no vested right" to use public streets pursuant to their beat ownership, and that the "Charter may further be amended to deprive existing Patrol Specials of exclusive ownership of their beats so long as reasonable provision is made for them to recoup their investment" (*id.* at 9). The City Attorney provided no legal authority for the conclusion that the patrol specials needed reasonable provisions to recoup their investments.

In August 1993, Samuel Reyes and the San Francisco Patrol Special Police Officers Association, on behalf of all of its members (both plaintiffs herein as well) sued San Francisco and three police officers in San Francisco Superior Court. The plaintiffs therein advanced the theory, *inter alia*, that San Francisco's provision of competing police services pursuant to Administrative Code Section 10B violated the rights of the patrol special police officers to provide services within their beats, which, they claimed, constituting taking without just compensation (*see* Dkt. No. 6-3, at 32–74). An order sustained the defendants' demurrer as to the inverse condemnation claim without leave to amend (Defs.' RJN, Exh. M).

In November 1994, the Police Commission adopted a substantial revision to the rules governing patrol special police officers (Defs.' RJN, Exh. G). Notwithstanding the City Attorney's earlier advice, these rules deprived the patrol special police officers of their status as peace officers, relegating them to duties more akin to private security guards than police officers. The rules also required the owners of beats to "personally participate in the patrol of their beats" rather than relying "solely on assistants to conduct patrol services" (*id.*, Rule 4.11).

In December 1994, another group of patrol special police officers, Robert Hart, Samuel Reyes, Serge White, Calvin Wiley, Theodore Torres, and John Andrews, sued San Francisco and the Police Commissioners. Robert Hart is the predecessor-in-interest of two plaintiffs herein, Todd and Scott Hart, and the remaining plaintiffs in the 1994 action are also plaintiffs herein. The 1994 complaint alleged the defendants had caused a "de facto elimination" of the patrol special police officers and that they had no intention of compensating the plaintiffs for

4

that "taking" (Defs.' RJN, Exh. P). Demurrer was sustained and affirmed on appeal (Defs.' RJN, Exh. T).

In August 1995, the same plaintiffs from the 1994 action plus several others, including one plaintiff herein, Anthony Cirimele, again sued San Francisco and several of its employees. The complaint therein sought inverse condemnation and a writ of mandate (*See* Defs.' RJN, Exh. U). Demurrer was again sustained (Defs.' RJN, Exhs. Y, Z).

San Francisco amended its charter in 1996, which amended charter remains in effect today. The 1996 Charter continued to provide for patrol special police officers, but it included several substantive changes, as follows (*See* Defs.' RJN, Exh. E § 4.127):

> The Commission may appoint patrol special police officers and for cause may suspend or dismiss patrol special police officers after a hearing on charges duly filed with the Commission and after a fair and impartial trial. Patrol special police officers shall be regulated by the Police Commission, which may establish requirements for and procedures to govern the position, including the power of the Chief of Police to suspend a patrol special police position, including the power of the Chief of Police to suspend a patrol special police officer pending a hearing on charges. Each patrol special police officer shall be at the time of appointment not less than 21 years of age and must possess such physical qualifications as may be required by the Commission.
>
> Patrol special police officers may be designated by the Commission as the owners of a certain beat or territory which may be established or rescinded by the Commission. Patrol special police officers designated as the owners of a certain beat or territory or the legal heirs or representatives of the owners may dispose of their interest in the beat or territory to a person of good moral character, approved by the Police Commission and eligible for appointment as a patrol special police officer.
>
> Commission designation of beats or territories shall not affect the ability of private security companies to provide on-site security services on the inside or at the entrance of any property located in the City and County.

Critically for our purposes, the amendment authorized the Police Commission to *rescind* beats that had previously been designated.

In 2008, the Police Commission adopted interim rules, in preparation for a substantial overhaul of the rules that has not yet occurred (*see* Defs.' RJN, Exh. H). The 2008 interim rules remain in place today. The new rules reiterated that the San Francisco Police Department

5

1 expected patrol special police officers to work with private business and clients. The rules also limited the number of beats that a particular individual could own to three.

Plaintiffs filed their first complaint in this action on July 27, 2012, in Contra Costa County Superior Court. The parties underwent several venue-transfer motions and three rounds of demurrer practice in state court. Notably, in the order on defendants' demurrer to the fourth amended complaint, Judge Richard Ulmer, Jr., of San Francisco Superior Court ruled that plaintiffs' "inverse condemnation" claims for compensation following a taking under state law were barred by claim preclusion and issue preclusion, due to the actions brought in 1993–95 (*see* Dkt. No. 6-6 at 1–5). That order directed counsel to "meet and confer regarding the contents of the fifth amended complaint" (*id.* at 6).

Plaintiffs declined to meet and confer with defendants before filing their fifth amended complaint. That complaint asserted, for the first time, federal claims under Section 1983, as well as a claim for breach of contract. Defendants removed the action to federal court here in San Francisco in 2016, based on the new federal claims. Defendants then moved for a more definite statement, to dismiss the Section 1983 claims against the individual defendants, and to dismiss the contract claim. An order denied the motions for a more definite statement and to dismiss the contract claim, but granted the motion to dismiss the Section 1983 claims against the individual defendants.

After the extensive motion practice detailed above, plaintiffs now assert various constitutional, tort, and contract claims primarily focusing on the theory that the provision of police services pursuant to Section 10B impeded on their property interest in their beats.

Defendants now move for summary judgment on all claims. While this motion remained pending, plaintiffs moved to substitute the heirs of two individual plaintiffs. This order follows full briefing and oral argument on the summary judgment motion and full briefing on the motion to substitute.

**ANALYSIS**

The district court need not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). For the benefit of the court of appeals,

and to assist it in divining the file, this order pauses and describes the disorganized and sprawling state of the record. These problems — all of counsel's making — resulted even though the Court generously granted the full extensions sought by counsel for both sides as a result of illness and deaths in the family (Dkt. Nos. 60, 86).

The primary problem originated with plaintiffs' record in support of their opposition. When plaintiffs first opposed defendants' motion for summary judgment, Attorney Daniel Bakondi made three separate filings on the electronic court filing system. ECF allows attorneys to submit a digital file, which is given a title and a separate numbered docket entry (such as "docket number 5"), and to submit additional digital files to be associated with the initial file, with each associated file given a docket number derived from the number assigned to the main filing (such as "docket number 5-2" for the second document associated with "docket number 5") — essentially "sub-entries." Each primary entry is intended to be the main filing, such as a motion, with the sub-entries any item filed in conjunction with that filing, such as declarations, exhibits, and appendices. Civil Local Rule 5-1(e)(7) requires parties to "provide for chambers a paper copy of each document that is electronically filed," so each digital file should ultimately have a paper companion.

Attorney Bakondi filed plaintiffs' opposition brief as docket number 91 (which exceeded the page limits, not the main problem) along with six associated documents numbered 91-1 through 91-6, which became the main problem.

Docket number 91-1 was a two-page declaration from Attorney Bakondi, stating that despite being granted a prior extension due to his illness, he "ran out of time" and that there was "additional evidence that [he] requested time to submit," though Attorney Bakondi never actually sought a further extension or leave to file additional evidence.

Docket number 91-2 was a 213-page digital file that, upon inspection, was actually a collection of photocopies of dozens of unrelated, unlabeled sources all bundled in one file, including deposition transcripts, e-mail exchanges between counsel for both sides, photographs, and memoranda, *inter alia*. Docket numbers 91-3 through 91-6 were unlabeled photocopies ranging in length from two to twenty-three pages.

Attorney Bakondi also filed (after the deadline) as docket number 92 an item simply labeled "Exhibits," with six unlabeled filings, numbered 92-1 through 92-6 associated with it. Docket number 92 was a 710-page photocopy of dozens of unrelated and unlabeled sources that, like docket number 91-2, had been bundled in a single digital file. Docket numbers 92-1 through 92-6 were also unlabeled files, most of which were also massive bundles of photocopies of unrelated and unlabeled sources.

In all, Attorney Bakondi filed 1709 pages of unlabeled, unsworn photocopies from more than sixty different sources, but bundled together in twelve inscrutable digital files on ECF. Attorney Bakondi never provided an index or a declaration purporting to authenticate any part of the record.

Plaintiffs' counsel filed an amended opposition conforming to the page limits (Dkt. No. 93). Neither the original opposition nor the amended brief provided any clarity regarding the 1709 pages of exhibits submitted. Instead, the opposition merely offered inscrutable citations to items like "Yerba Buena, Uunion [sic] Square, Castro," "Police Commissioner hearing," and "Yick letters" but offered no means for locating or identifying those citations.

Attorney Bakondi failed to timely lodge chambers copies in violation of Civil Local Rule 5-1(e)(7). An order required Attorney Bakondi to promptly lodge chambers copies. Along with the belated chambers copies, Attorney Bakondi also provided an unauthorized supplemental declaration purporting to identify and authenticate the various documents in the record as organized for the chambers copies. He divided the chambers copies of the 1709 pages with numbered "tabs," and his supplemental declaration identified each of the provided exhibits by tab number. Amazingly, he did not provide a copy of the record with these dividing "tabs" to defense counsel. He also supplied an "objection to reply evidence" laden with new arguments and untimely discovery complaints.

An order set forth these problems and required Attorney Bakondi to resubmit plaintiffs' opposition brief, correcting the factual citations therein so they could be correlated with the documents in the record, and to file digital copies of each exhibit sought to be considered as evidence separately on ECF for easier review. The order also allowed plaintiffs or Attorney

8

Bakondi to submit supplemental declarations authenticating the exhibits sought to be considered. Finally, the order authorized defendants to file a new reply brief, with defense counsel's reasonable attorney's fees and costs incurred as a result of the rebriefing to be paid by Attorney Bakondi (Dkt. No. 99).

Plaintiffs' reworked opposition brief was a half-measure at best. Many citations remained inscrutable (despite crystal clear guidance as to how to write them), and authentication problems remained abundant. Additionally, Attorney Bakondi's second supplemental declaration (identifying the documents delineated by each "tab" in his supplemental record), did not discuss "tabs" 66 through 68 (though the pages so labeled did appear in the record as initially filed).

Defendants filed their second reply, and plaintiffs' counsel timely paid the assessed fees and costs.

For their part, defense counsel added to the confusion. Their opening motion omitted key procedural history items in the case. For example, although the statute of limitations received top billing in defendants' motion, the defense team failed to mention that this affirmative defense was already rejected at the pleading stage in state court in the order resolving their demurrer to the third amended complaint. They continued to ignore this issue when raised by plaintiffs in opposition (and again in plaintiffs' revised opposition).

They also omitted factual citations for key facts. Most notably, defendants failed to provide any documentation of the history of Administrative Code Section 10B (or even the text of the code *at all*). They similarly asserted — ipse dixit — a supposed legislative purpose for Section 1750 of the San Francisco Police Code, but they failed to provide a citation or a copy of the ordinance enacting that provision.

Moreover, they omitted documents that their briefs indicated they included. For example, they stated that the complaint for the *Reyes* action filed in 1993 was among Exhibits I through O of their Request for Judicial Notice — but it was not.

Defense counsel also filed its evidentiary objections separately (as opposed to within the page limit for the reply), in violation of Civil Local Rule 7-3(a). Although the need to file a

9

separate document was facially apparent in light of the mountain of evidentiary issues in plaintiffs' submissions, defendants should have sought leave to file a separate objections document. This unauthorized brief drew a motion to strike the unauthorized objections from our plaintiffs, which motion was laden with unsolicited substantive arguments about the underlying issues, rather than merely focusing on striking the objections.

Rather than suss out which unauthorized submissions by which parties were justified and striking the rest or striking all unauthorized submissions entirely, this order now considers them in full to the extent comprehensible, notwithstanding the nightmare snafus. All pending motions to strike are therefore **DENIED**.

This order now turns to the merits.

**1. CONSTITUTIONAL CLAIMS.**

Plaintiffs assert three categories of constitutional claims. *First*, they assert that defendants' conduct in offering services pursuant to Administrative Code Section 10B constituted a taking for which plaintiffs are entitled to just compensation. *Second*, they assert due process violations. *Third*, they assert they were denied equal protection of the law. This order addresses each in turn.

**A. INVERSE CONDEMNATION.**

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use without just compensation." Via the Fourteenth Amendment, this applies to the states as well. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 536 (2005).

Plaintiffs contend they are entitled to just compensation for the diminishment in value of their interests in their beats because the San Francisco Charter designated them as "the owners of a certain beat or territory" (*see* Defs.' RJN, Exh. E § 4.127). Plaintiffs contend defendants engaged in inverse condemnation of their beats by offering competing patrol services pursuant to Administrative Code 10B without compensating plaintiffs for the diminished value of their beats as a result of competition. They claim constitutional violations under Section 1983 on that theory.

Although the issues presented herein have been addressed in state court on numerous occasions, each such case was resolved on some procedural ground, such as the statute of limitations or claim preclusion. (Defendants advance similar arguments here.) No decision has directly resolved the question of whether the beats granted to the patrol special police officers constitute "property" subject to the Takings Clause.

In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 56 (1986), the United States Supreme Court examined whether a state's interest in withdrawing social security funds promised under an agreement pursuant to a statute warranted the protection of the Takings Clause when the United States amended the statute and eliminated that program.

There, because the rights at issue remained subject to Congress's authority to amend the program at issue, the states' interest did not rise to the level of "property." Nor here. All agree that, after the 1996 amendment to the Charter, the Police Commissioner could rescind beats without compensation. Thus, as with the rights at issue in *Bowen*, our plaintiffs' rights "simply cannot be viewed as conferring any sort of 'vested right'" subject to the Takings Clause.[1]

While this case proceeded through demurrer practice in state court, an order overruled defendants' demurrer on plaintiffs' state inverse condemnation claims, describing plaintiffs' ownership interests as "close kin to a franchise, like those often granted cable-television providers" (*see* Notice of Removal, Exh. 42, Dkt. No. 6-1). Plaintiffs now contend that analogy, under California's demurrer standard and applying California law of inverse condemnation, entitles them to survive summary judgment on their federal claim. Not so.

Judge Ulmer did not directly examine the rights conferred on our plaintiffs via the Charter, and, notably, he did not consider the possibility of rescission by the Police Commissioner. Moreover, his examination considered *state* law and the *demurrer* standard, neither of which applies to this federal claim at summary judgment. That statement is neither persuasive nor law of the case.

---

[1] Although *Bowen* referred to the state's interest as a "contractual right" (the decision used the quotation marks), it also held that the statute "created no contractual rights." *Id.* at 52.

11

Nor does the 1987 opinion of the City Attorney save plaintiffs. That opinion stated that the Charter could be "amended to deprive existing Patrol Specials of exclusive ownership of their beats so long as reasonable provision is made for them to recoup their investment." That opinion considered the issue of recoupment under *state* law. Moreover, it further specifically stated that "Patrol Specials have no vested right to use public streets" pursuant to their beat ownership (Baumgartner Decl., Exh. 16 at 9).

Plaintiffs contend — and defendants agree — that notwithstanding the foregoing, their interests in their beats remain subject to the protections of the Due Process Clause. Assuming, without deciding, that they are entitled to such protection notwithstanding the foregoing, this order now turns to the alleged of due process violations.

**B.  DUE PROCESS.**

Plaintiffs bring claims for violations of their procedural and substantive due process rights. All individual defendants have been dismissed from the federal claims (Dkt. No. 15). Thus, our plaintiffs must prove that any constitutional violations they suffered resulted from a policy or custom of the City and County of San Francisco. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Ultimately, plaintiffs' arguments boil down to the assertion that our defendants have implemented practices that degrade the patrol special police officers without the formality of rescinding their beats. For example, they argue defendants have strictly enforced rules requiring patrol special police officers to personally patrol their own beats. But they offer no evidence of due process denied, they simply offer complaints that they have been unable to find a market for their services or to comply with the rules that are now being enforced. That is insufficient to survive summary judgment.[2]

As to substantive due process, plaintiffs fail to identify any conduct by our defendants that "shocks the conscience." *Lewis v. County of Sacramento*, 523 U.S. 833, 847 (1998). They

---

[2] Certain allegations in the opposition would require scouring the still-inscrutable record to determine whether some dispute of fact exists (and if so, whether it is supported by admissible evidence). For example, plaintiffs refer to a vague irregularity in a hearing regarding disciplinary charges against patrol special police officer plaintiff John Barry, citing only "Barry Depo" as support (Pls.' Opp. at 29). The deposition of John Barry does not appear in plaintiffs' submissions at all, and the portions of Barry's deposition submitted by defendant do not relate to plaintiffs' assertion (Baumgartner Decl., Exh. 2, Barry Dep.).

12

simply argue that defendants' alleged internal efforts to eliminate the patrol special police officer program "shocks the conscience" inasmuch as it constitutes "[c]ontinuing to deny elderly and disabled Plaintiffs the value of property set aside for retirement, and needed for end of life care, after promising to allow them to 'recoup their investment'" (Pls.' Opp. at 32).

No such promise was made. The alleged assurance that our plaintiffs could recoup their investments appeared in a non-binding public opinion from the City Attorney pursuant to an *earlier version of the charter*, and without identifying any authority supporting that position.

Moreover, the scenario plaintiffs describe is not conduct that shocks the conscience, but rather the remote consequence of San Francisco's oversight over the patrol special police officers and Sa Francisco's simply providing competing police services to the public. Plaintiffs' substantive due process claim also fails. Due process does not shield plaintiffs from competition or regulation.[3]

### C. EQUAL PROTECTION.

Plaintiffs allege that they have been denied equal protection under the law. In their motion, defendants contend plaintiffs can offer no evidence of similarly-situated individuals who received different treatment based on membership in a different class. In opposition, plaintiffs make only a passing reference to their equal protection claim, and make absolutely no effort to substantiate it. Accordingly, summary judgment on plaintiffs' equal protection claims is **GRANTED**.

\*     \*     \*

Plaintiffs' claims under the state constitution mirror their federal constitutional claims, and fail for the same reasons.[4]

---

[3] To be clear, it is immaterial whether the provision of police services under Section 10B of the Administrative Code actually "competes" with the patrol special police officers' services. Defendants are entitled to provide this public service notwithstanding plaintiffs' "ownership" of their beats.

[4] For the first time in opposition to defendants' motion for summary judgment, plaintiffs contend that the San Francisco Board of Supervisors entered into contracts with private security firms to engage in certain patrols on the streets, which, they contend, constitute further constitutional violations. These allegations never appeared in the pleadings, despite six amendments and will not be considered at this late stage.

13

## 2. CONTRACT CLAIMS.

The order on defendants' Rule 12 motion rejected plaintiffs' theory that they entered into a contract with defendants via the City Charter. In briefing that motion, plaintiffs pivoted, and clarified their theory that when the City granted beats to the patrol special police officers, that transaction included oral and implied promises, including a promise that the Police Commission would not interfere with their rights to patrol beats.

Section 6.102(6) of the San Francisco Charter provides that the City Attorney must "Approve as to form all . . . contracts . . . ." In *Katsura v. City of San Buenaventura*, 155 Cal. App. 4th 104 (2007), the California Court of Appeal reiterated settled law that "the mode of contracting as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable." *Id.* at 109 (quoting *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 288, 242 (2002)). *Katsura* went further, and held that a city could not be held liable for the terms of oral contracts or implied contracts, where the city's charter was silent on whether or how such contracts may be formed.

Our plaintiffs offer testimony about their understanding of defendants' intent to abide by the terms of the alleged contract set forth above, but they set forth no evidence whatsoever that any defendant manifested intent to enter into such a contract, or that such a contract complied with the procedure prescribed by the Charter. It is of no moment that our plaintiffs believed they had entered a contract: "Persons dealing with a public agency are presumed to know the law with respect to any agency's authority to contract." *Ibid.*

Plaintiffs have failed to offer any evidence of a contract, and so defendants' motion as to plaintiffs' contract claims is **GRANTED**.

## 3. NEGLIGENCE CLAIMS.

Pursuant to Section 815(a) of the California Government Code, except as otherwise provided by statute, "[a] public entity is not liable for an injury, whether such injury arises out of an act or omission or a public employee or any other person." Section 815.6 provides that a public entity *may* be held liable when it is subject to a "mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury . . . ."

14

Plaintiffs assert claims for negligence, contending that defendants violated their duties pursuant to Section 1750 of the San Francisco Police Code, Section 4.127 of the San Francisco Charter, and Section 10B of the San Francisco Administrative Code.

Section 1750 of the Police Code requires registration of private protection and security services, a requirement that has not been enforced for some time. From the face of Section 1750, and the related provisions, all enacted by the same ordinance, this provision is designed for consumer-protection and public-safety purposes. There is no indication (and plaintiffs offer none) that Section 1750 was designed to protect the value of our plaintiffs' beats.

Plaintiffs offer no evidence that defendants *violated* Section 4.127 of the Charter, which authorizes the regulation and removal of the patrol special police officers. On the contrary, this lawsuit is premised on defendants' enforcement of that provision.

Finally, plaintiffs contend that the Chief of Police failed to personally approve all requests for police services under Section 10B of the Administrative Code (although "approval" is defined to mean the Chief's signature). Plaintiffs again fail to show this provision was designed for their protection. Moreover, it is not clear that the definition of approval in Section 10B precludes the Chief from delegating review of requests to his staff.

Plaintiffs have failed to identify a statutory duty that our defendants breached. Accordingly, defendants' motion for summary judgment on the negligence claims is **GRANTED**.

### 4. UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST.

The sixth amended complaint purports to assert claims for "unjust enrichment" and "constructive trust." But those are remedies available in limited circumstances, not standalone claims. *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 76 (1990). This order need not address whether the remedies would be available here inasmuch as the forgoing holds plaintiffs claims fail to survive summary judgment. Accordingly, defendants' motion for summary judgment is **GRANTED** as to these claims as well.

### 5. UNFAIR COMPETITION AND UNFAIR PRACTICES CLAIMS.

In their complaint, plaintiffs asserted claims under Section 17000 and Section 17200 of the California Business and Professions Code. Section 17000 prohibits unfair practices, and Section 17200 prohibits unlawful, unfair, or fraudulent business practices. In their motion,

1 defendants contended that plaintiffs could not provide admissible evidence of any practice that could constitute a violation of these provisions. In fact, plaintiffs do not address these claims *at all* in their opposition brief. Nor do they cite any evidence relating to the allegations pled in relation to that claim.

Defendants' motion for summary judgment on these claims is **GRANTED**.

### 6. EVIDENTIARY AND DISCOVERY RULINGS.

Both sides filed extensive objections to evidence submitted by the other side. Except to the extent discussed above, the objected-to evidence was not necessary to this order, and all objections are therefore **OVERRULED AS MOOT**.

Both sides requested judicial notice of public records relating to the laws and rules governing the patrol special police officers, including published opinions thereon, as well as publicly-filed documents from prior litigation. To the extent such documents are cited above, the requests are **GRANTED**. Any documents not cited above were not necessary to this order, and requests for judicial notice thereof are **DENIED AS MOOT**.

In his declaration in support of his opposition, plaintiffs' counsel contended that, due to a lack of time he could not provide all the evidence they could. This is too little too late. Plaintiffs' counsel had ample time to request a further extension of the deadline. Moreover, they have had more than four years to organize this case since its inception. Plaintiffs' counsel further fail to identify any specific evidence that might have been included with more time,

For the first time in plaintiffs' objection to reply evidence, plaintiffs contend they could not present facts to justify their opposition, pursuant to Rule 56(d). They contend they have been fighting for evidence for months, but met difficulties inasmuch as Judge Donna Ryu, to whom discovery disputes have been referred, ruled against them. They further note that one discovery dispute remains pending, and ask that this motion be held in abeyance pending its resolution.

A motion under Rule 56(d) requires plaintiffs' counsel to show due diligence. *Martinez v. Columbia Sportswear USA Corp.*, 533 Fed. Appx. 760, 761 (9th Cir. 2014). Plaintiffs' counsel made no such showing. Indeed, the forgoing description of plaintiffs' snafus as well as

further procedural errors in prosecuting the very discovery dispute at issue (*see* Dkt. No. 76), demonstrate a *profound* lack of diligence. Plaintiffs' motion under Rule 56(d) is **DENIED**.

### 7. SUBSTITUTION OF PARTIES.

Upon the death of two plaintiffs, Earl Curtis and Serge White, plaintiffs seek to substitute parties pursuant to FRCP 25(a)(1). Plaintiffs seek to substitute Antonio White for Serge White, and defendants do not oppose. Plaintiffs seek to substitute both Caroline and Julia Curtis (his granddaughter and wife, respectively) for Earl Curtis, and defendants object inasmuch as the declaration supporting that motion is signed by two parties, but the declaration is written in the first-person singular (using "I," instead of "we").

Plaintiffs respond that they are willing to substitute only one individual, but fail to identify the individual. This order allows the substitution of Julia Curtis for Earl Curtis.

## CONCLUSION

Plaintiffs are the beneficiaries of an archaic scheme that allowed private citizens to carry guns and to exercise public law enforcement powers. For the safety of its citizens, the local government necessarily needs to regulate this private regime. That private police force cannot and should not complain that ever-stricter protections have restricted their freedom of movement. Nor can they complain that the official police force is "competing" with them by supplying police services to the public that in days gone by were left to them.

To the extent stated above, defendants' motion for summary judgment is **GRANTED**.

Plaintiffs' requests to substitute parties are **GRANTED** as follows: Julia Curtis is substituted for Earl Curtis, and Antonio White is substituted for Serge White. The captions on all future filings shall please reflect that substitution.

Judgment will follow.

**IT IS SO ORDERED.**

Dated: May 25, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17